1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   WORLD SKATEBOARDING                          No.  2:16-cv-02065-KJM-GGH
     FEDERATION, INC.,
12
                          Plaintiff,
13                                                 ORDER
               v.
14
     INTERNATIONAL SKATEBOARDING
15   FEDERATION, and GARY REAM,

16                        Defendants.

17

18

19              This case arises from a contract that the parties allegedly formed in Switzerland

20   concerning the creation of a commission tasked with organizing and planning the skateboarding

21   events for the 2020 Olympic Games in Tokyo.  Defendants International Skateboarding

22   Federation ("ISF") and Gary Ream move to dismiss the complaint brought by plaintiff World

23   Skateboarding Federation, Inc. ("WSF") for lack of jurisdiction.  ECF No. 4.  Plaintiff opposes.

24   ECF No. 22.  The court held a motion hearing on November 4, 2016, at which Karra Porter and

25   Phillip Lowry appeared for plaintiff, and John Poulos and Richard Wickersham appeared for

26   defendants.  ECF No. 27.  For the following reasons, the court GRANTS defendants' motion.

27   /////

28   /////

                                                1

1    I.        FACTUAL ALLEGATIONS

2                In and prior to 2006, the International Olympic Committee ("IOC") began

3    exploring the possibility of bringing skateboarding to the Olympics.  Compl. ¶ 13.  Years later, as

4    the IOC actually considered including skateboarding in the 2020 Olympic Games, it invited "key

5    stakeholders" into discussions, including plaintiff WSF and defendant ISF.  *Id.* ¶ 17.  WSF's

6    principal and founder, Tim McFerran, is a luminary in the skateboarding industry, and has led

7    efforts to expand competitive skateboarding across the world.  *Id.* ¶¶ 25–47.  By May 2015, of the

8    key stakeholders WSF was the largest and most active federation for skateboarding.  *Id.* ¶ 36.

9    ISF, on the other hand, was formed by Ream in 2003, and the organization was largely inactive

10   through the end of 2014.  *Id.* ¶ 49.  In 2009, Ream called McFerran and introduced himself as the

11   President of ISF, *id.* ¶ 50; he told McFerran that his personal friend, Christophe Dubi was now the

12   IOC Olympic Games Executive Director and was going to help Ream get skateboarding

13   recognized in the 2012 Olympic Games, *id.* ¶¶ 50, 87.  In the same conversation, Ream requested

14   that McFerran pay Ream $200,000 for ISF to sanction an international skateboarding event

15   organized by McFerran.  *Id.* ¶ 50.  When McFerran refused to pay, Ream told McFerran he would

16   ensure McFerran was not a part of the Olympic Games unless he agreed to pay the $200,000 fee.

17   *Id.*

18               In 2014 and 2015, McFerran and Ream engaged in discussions separately with the

19   IOC to bring skateboarding to the 2020 Olympic Games.  *See id.* ¶¶ 74–75.  During this time,

20   Ream and ISF held multiple meetings in California.  In January 2015, in southern California, ISF

21   held an invitation-only meeting with members of the skateboarding industry.  *Id.* ¶ 53.  At that

22   meeting Ream bragged about his special relationship with IOC Executive Director Dubi, and

23   suggested that Dubi was helping him make ISF the official organizer for skateboarding at the

24   2020 Olympic Games.  *Id.* ¶ 93.  In February 2015, in Los Angeles, the IOC attended a meeting

25   with ISF board members that ISF described as an "emergency" meeting to discuss bringing

26   skateboarding to the 2020 Olympic Games.  *Id.* ¶ 75.  In March 2015, again in Los Angeles, ISF

27   held an additional invitation-only meeting, this time with associates of Ream.  *Id.* ¶ 55.

28

                                              2

1        On March 11, 2015, in Switzerland, the IOC's Sports Director told ISF and WSF

2    they would have to work together for skateboarding to be included on the 2020 Olympic Games

3    program.  *Id.* ¶¶ 17, 24, 76.  The same month, in Turkey, an IOC representative reported that

4    "were it not for McFerran, skateboarding would not be considered for the 2020 Olympic Games."

5    *Id.* ¶ 80.  Around that time, Ream began falsely claiming to third parties that the IOC had selected

6    ISF as the International Federation, meaning the sole organizer, for skateboarding in order to gain

7    favor within the skateboarding industry.  *Id.* ¶¶ 84, 89.

8        On March 15, 2016, the IOC invited McFerran and Ream to a meeting in

9    Switzerland, where WSF and ISF entered into an agreement to create a Tokyo 2020 Olympic

10   Skateboarding Commission ("Commission") for the purpose of organizing and planning the

11   skateboarding events for the 2020 Olympic Games.  *Id.* ¶ 106.  The IOC appointed Ream as

12   Chairman of the Commission, *id.* ¶ 107, told McFerran he was to be an active participant in the

13   leadership, *id.* ¶ 116, and told Ream he would have to put the interests of the Commission above

14   those of ISF, *id.* ¶ 107.  One of McFerran's duties as a member of the Commission, a duty he was

15   assigned by the IOC, was to develop a list of contests and qualifying events.  *Id.* ¶ 116.  The IOC

16   also told McFerran it was a "good idea" for WSF to be the point organization for the Pan

17   American Games and Commonwealth Games.  *Id.*  Relying on the agreement to create the

18   Commission as well as the IOC's promises, McFerran continued to incur expenses, *id.* ¶ 113, and

19   began negotiating and signing contracts with foreign governments regarding events that would be

20   qualifiers for the 2020 Olympic Games, *id.* ¶ 117.

21       On May 9, 2016, Ream and the IOC circulated a draft memorandum of

22   understanding meant to memorialize the agreement WSF and ISF entered into on March 15,

23   2016.  *Id.* ¶ 120.  The draft did not identify WSF as a member of the Commission.  *Id.*

24       On May 12, 2016, the IOC told McFerran to meet the next day with Ream in

25   Anaheim, California, where Ream was attending a skateboarding conference.  *Id.* ¶ 121.  It is

26   unclear from the complaint whether McFerran attended this conference or met with Ream.  What

27   is clear from the complaint, however, is WSF's contention that Ream leveraged his personal

28   relationship with IOC Executive Director Dubi to position ISF as the sole organizer of

3

1   skateboarding events for the Olympic Games, to the detriment of WSF and McFerran. *See*

2   ¶¶ 88-95. As a result, on May 30, 2016, the IOC held a meeting with ISF without inviting WSF,

3   where the IOC and ISF agreed to a memorandum of understanding that excluded WSF from the

4   Commission. *Id.* ¶¶ 126–28.

5   II.    PROCEDURAL BACKGROUND

6          On July 28, 2016, WSF filed a complaint against ISF and Gary Ream in the

7   Superior Court of California, Placer County, in which it pleads the following: (1) Breach of

8   Contract (defendant ISF), *id.* ¶¶ 140–46; (2) Breach of the Implied Covenant of Good Faith and

9   Fair Dealing (defendant ISF), *id.* ¶¶ 147–55; (3) Unfair Competition and Unfair Business

10   Practices (all defendants), *id.* ¶¶ 156–64; (4) for declaratory relief, *id.* ¶¶ 165–68; (5) for an

11   injunction, *id.* ¶¶ 169–75; and (6) breach of fiduciary duty (all defendants), *id.* ¶¶ 176–83.

12          On August 29, 2016, WSF removed the case to this court. ECF No. 1. The next

13   day, on August 30, defendants filed a motion to dismiss, alleging the court lacks jurisdiction.

14   Defs.' Mot. to Dismiss ("Defs.' MTD") at 5–8, ECF No. 4-1. WSF opposes, Pl.'s Opp'n, ECF

15   No. 22, and defendants replied, ECF No. 24. For the following reasons, the court grants

16   defendants' motion to dismiss for lack of jurisdiction.

17   III.    DISCUSSION

18          Defendants argue they are not subject to the jurisdiction of this court because

19   defendants and the alleged contract formed in Switzerland do not have the requisite contacts with

20   California. Defs.' MTD at 5–8. Alternatively, defendants seek to join necessary parties, *id.* at

21   8-11; request that plaintiff file an amended complaint with a more definite statement, *id.* at 11–13;

22   and/or provide an amended complaint that strikes immaterial, impertinent, and scandalous

23   allegations, *id.* at 13–14. The court reaches only the threshold jurisdictional question at this

24   juncture.

25          Defendants argue WSF's claims must be dismissed because this court lacks

26   general and specific personal jurisdiction. Defs.' MTD at 5–8. Plaintiff responds that the

27   complaint, supplemented by McFerran's supporting declaration in opposition, sets forth sufficient

28   contacts to establish general and specific jurisdiction. Pl.'s Opp'n at 2–3.

1           Rule 12(b)(2) of the Federal Rules of Civil Procedure provides that a party may

2    move to dismiss a complaint for lack of personal jurisdiction.  Although the defendant brings the

3    motion, it is the plaintiff's burden to establish the court's personal jurisdiction.  *See Sher v.*

4    *Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990).  If the motion is based on written materials rather

5    than an evidentiary hearing, as in this case, the plaintiff need only make "a prima facie showing

6    of jurisdictional facts to withstand the motion to dismiss."  *Brayton Purcell LLP v. Recordon &*

7    *Recordon*, 606 F.3d 1124, 1127 (9th Cir. 2010) (quotation omitted).  In particular, the plaintiff

8    must convince the court the defendants' "conduct and connection with the forum State [is] such

9    that the defendants should reasonably anticipate being haled into court there."  *Sher*, 911 F.2d at

10    1361 (quotation marks omitted) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S.

11    286, 297 (1980)).  After plaintiff makes a prima facie showing, the court resolves all contested

12    facts in plaintiff's favor.  *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 741

13    (9th Cir. 2013), *aff'd sub nom. Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591 (2015).  At the same

14    time, the plaintiff cannot establish jurisdiction by alleging bare facts without providing some

15    evidence of their existence, "by affidavit or otherwise."  *Amba Mktg. Sys., Inc. v. Jobar Int'l, Inc.*,

16    551 F.2d 784, 787 (9th Cir. 1977); *accord Ochoa v. J.B. Martin & Sons Farms, Inc.*, 287 F.3d

17    1182, 1187 (9th Cir. 2002).

18           In resolving a Rule 12(b)(2) motion, the court may consider evidence outside the

19    pleadings, including affidavits and other materials submitted with the motion.  *See Daimler AG v.*

20    *Bauman*, 134 S. Ct. 746, 752 (2014) (noting plaintiff in a Rule 12(b)(2) motion submitted

21    declarations and exhibits purporting to demonstrate defendant's contacts to the forum state).  The

22    court may consider "relevant materials outside the pleadings without taking judicial notice of

23    those materials."  *Lindora, LLC v. Isagenix Int'l, LLC*, 198 F. Supp. 3d 1127, 1136 n.3 (S.D. Cal.

24    2016) (citing *Stewart v. Screen Gems-EMI Music, Inc.*, 81 F. Supp. 3d 938, 951–52 (N.D. Cal.

25    2015)).  Here, the court considers whether it has general or specific jurisdiction over defendants

26    in turn.

27    /////

28    /////

1    A.    General Jurisdiction

2         "A court may assert general jurisdiction over foreign (sister-state or foreign-

3    country) corporations to hear any and all claims against them when their affiliations with the State

4    are so 'continuous and systematic' as to render them essentially at home in the forum State."

5    *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011) (quoting *Goodyear*

6    *Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).  The standard for general

7    jurisdiction is exacting and is satisfied only by a showing of substantial operations in the state,

8    marked by "longevity, continuity, volume, economic impact, physical presence, and integration

9    into the state's markets."  *Mavrix*, 647 F.3d at 1224.  At the November 4, 2016 hearing, plaintiff

10    conceded the court does not have general jurisdiction over defendants in this case.

11    B.    Specific Jurisdiction

12         In determining whether this court has personal jurisdiction, the court looks to the

13    personal jurisdiction rules of the forum state, provided the exercise of jurisdiction comports with

14    due process.  *Scott v. Breeland*, 792 F.2d 925, 927 (9th Cir. 1986).  California imposes no greater

15    restrictions than the United States Constitution, and as such, "federal courts in California may

16    exercise jurisdiction to the fullest extent permitted by due process."  *Id.*

17         A court may exercise specific personal jurisdiction over a non-resident defendant

18    whose "minimum contacts" with the forum state are "sufficient" in that they relate to the claims

19    made in a case.  *Sher*, 911 F.2d at 1361. The minimum contacts inquiry focuses "on the

20    relationship among the defendant, the forum, and the litigation."  *Walden v. Fiore*, 134 S. Ct.

21    1115, 1121 (2014) (quotation omitted).  The Ninth Circuit has established a three-pronged

22    conjunctive test for determining whether the plaintiff has alleged sufficient "minimum contacts":

23             (1) The non-resident defendant must purposefully direct his
                 activities or consummate some transaction with the forum or
24             resident thereof; or perform some act by which he purposefully
                 avails himself of the privilege of conducting activities in the forum,
25             thereby invoking the benefits and protections of its laws; (2) the
                 claim must be one which arises out of or relates to the defendant's
26

27

28

                                             6

forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015) (quoting *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004)).  These prongs are identified in shorthand fashion as: (1) purposeful availment and direction, (2) forum-related conduct, and (3) reasonableness. *See Menken v. Emm*, 503 F.3d 1050, 1057 (9th Cir. 2007).

When a plaintiff seeks to invoke specific personal jurisdiction, the plaintiff must establish jurisdiction for "each claim asserted against a defendant." *Picot*, 780 F.3d at 1211 (citation omitted).  If personal jurisdiction attaches as to one claim, but not others, the district court may exercise pendent personal jurisdiction over any remaining claims that arise out of the same "common nucleus of operative facts" as the claim for which jurisdiction exists.  *Id.*

### 1.     Purposeful availment and direction

Under the first prong, the plaintiff must establish defendants either purposefully availed themselves of the privilege of conducting activities in California, thus invoking the benefits and protections of its laws, or purposefully directed their activities toward California. *Schwarzenegger*, 374 F.3d at 802; *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985).  In the Ninth Circuit, the "purposeful availment" requirement is satisfied if a defendant has taken deliberate action within the forum state or if it has created continuing or ongoing obligations to forum residents.  *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995) (citing *Hirsch v. Blue Cross, Blue Shield of Kan. City*, 800 F.2d 1474, 1478 (9th Cir. 1986)).  Under the rubric of personal availment, the Ninth Circuit has held that "[i]t is not required that a defendant be physically present within, or have physical contacts with, the forum, provided that his efforts are purposefully directed toward forum residents."  *Id.* (quotations and citations omitted).

In *Cubbage v. Merchent*, for example, the Ninth Circuit held an Arizona hospital personally availed itself of California's jurisdiction for purposes of litigation of a malpractice action.  744 F.2d 665, 669 (9th Cir. 1984).  The hospital argued its doctors were not California residents, it was not licensed in California, and it did not treat the plaintiff in California, but the

1   Circuit found California had jurisdiction because the hospital applied for and received

2   reimbursement from California's Medi-Cal program, and solicited California residents through a

3   telephone listing distributed to forum residents.  *Id.* at 668–69.  The hospital's conduct amounted

4   to "continuing efforts to provide services [to residents] in California," i*d.* at 670, and was

5   sufficient to establish specific personal jurisdiction over the Arizona hospital, *id.* at 672.

6           Similarly, in *Ballard*, 65 F.3d at 1498, the Ninth Circuit held an Austrian bank had

7   personally availed itself of jurisdiction in California, even though its physical contacts were

8   "quite limited."  The bank's physical contacts to the United States and California consisted of

9   twenty-four business trips taken by bank officials, for business reasons unrelated to the case in

10  *Ballard*.  *Id.*  The Ninth Circuit still found the bank had personally availed itself of California's

11  jurisdiction, however, because "more than 60 percent of [the bank's] customers live[d] in the

12  United States [and American residents were] the beneficiaries of millions of dollars of [bank]

13  loans[; the bank] regularly mail[ed] account statements to its U.S. customers, and it at least

14  occasionally solicits new business from them[; and the bank] maintain[ed] 'correspondent

15  accounts' at several major U.S. financial institutions" for the purpose of giving bank access to

16  American customers.  *Id.*

17          In this case, ISF and Ream held at least five corporate meetings and a focused

18  meeting for ISF officials in California, Compl. ¶ 7(a) and (c), and many of ISF's general

19  members and members of its leadership reside in California, *id.* ¶ 7(d).  ISF specifically held

20  meetings with the IOC in California to discuss questions about the 2020 Tokyo Olympics.  *Id.*

21  ¶ 7(b).  ISF advertises its California events on its website, it does business with California

22  corporations, and it is endorsed by California organizations.  *Id.* ¶ 7(e)–(g).  These contacts are

23  sufficient to demonstrate that ISF has purposefully directed its efforts towards California.  *See*

24  *Carroll Shelby Licensing, Inc. v. Tango Classic Autos, Inc.*, No. 15-06264, 2015 WL 12765632,

25  at *4 (C.D. Cal. Dec. 10, 2015) (finding purposeful availment where defendant maintained

26  passive website, traveled to California several times on business, and purchased and sold five cars

27  to California residents); *Hernandez v. City of Beaumont*, No. 13-00967, 2014 WL 6943881, at *5

28

8

1   (C.D. Cal. Dec. 8, 2014) (finding purposeful availment where defendant maintained a passive

2   website and trained an individual at a tradeshow located in California).

3             2.    <u>Forum-related conduct</u>

4         Once a plaintiff establishes personal availment, the plaintiff must show the claim

5   arises out of the defendants' forum-related activities.  To satisfy this requirement, the plaintiff

6   must show the claim would not have arisen "but for" the defendants' contacts with the forum

7   state.  *Ballard*, 65 F.3d at 1500.  The question in this case can be formulated as follows:  But for

8   defendants' contacts with California, would WSF's claims against defendants have arisen?  *See*

9   *Mattel, Inc. v. Greiner & Hausser GmbH*, 354 F.3d 857, 864 (9th Cir. 2003).  The answer here

10  shows the court does not have jurisdiction over defendants.

11        The contract at issue in this case was formed between plaintiff and defendants in

12  Switzerland.  Compl. ¶ 106.  WSF has made no showing that any component of the contract was

13  negotiated or entered into in California, that any breach occurred in California, or that any of its

14  tortious claims arose in California.  California may, as plaintiff alleges, be the center of the

15  skateboard universe, *see* Pl.'s Opp'n at 3, but this court fails to see how the Ninth Circuit's but-

16  for test is satisfied when the contract was formed out of the country (Switzerland); concerns

17  events scheduled to take place in another country (Japan); the defendants and concerned third

18  parties, including the IOC, based in Switzerland, all reside out-of-forum; and no activities related

19  to the breach of this contract occurred in California.

20            3.    <u>Reasonableness</u>

21        The court need not reach the question of reasonableness.

22  IV.    <u>CONCLUSION</u>

23        Because this court lacks jurisdiction over defendants, defendants' motion to

24  dismiss under Federal Rule of Civil Procedure 12(b)(2) is GRANTED.  Federal Rule of Civil

25  Procedure 15(a)(2) provides that "[t]he court should freely give [a party leave to amend its

26  pleading] when justice so requires," and the Ninth Circuit has "stressed Rule 15's policy of

27  favoring amendments."  *Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir.

28

9

1989).  Because amendment has not been shown to be futile, plaintiff is granted leave to amend

its complaint within fourteen (14) days of the filing of this order.

          IT IS SO ORDERED.

DATED:  March 24, 2017.

_____
UNITED STATES DISTRICT JUDGE